## STANDARD ACCIDENT INSURANCE COMPANY V. GUY A. THOMPSON, TRUSTEE.

No. 7841.  Decided April 15, 1942.
Rehearing overruled May 13, 1942.
(161 S. W., 2d Series, 786.)

*Kemper, Hick & Cramer*, of Houston, for plaintiff in error.

It was error for the Court of Civil Appeals to hold that the policy of insurance did not contain any limitation covering the accident in question, and in holding that such policy, in spite of such express limitation as set out in the endorsements, extended coverage to such accident. And such holding conflicts with the decision of U. S. Fidelity & Guar. Co. v. Baldwin Motor Co., 34 S. W. (2d) 815. Travelers Ins. Co. v. Harris, 212 S. W. 933; Washington Fid. Natl. Ins. Co. v. Williams, (Com. App.) 49 S. W. (2d) 1093; Great So. Life Ins. Co. v. Akins, 105 S. W. (2d) 902.

*Andrews, Kelley, Kurth & Campbell* and *F. L. Andrews*, all of Houston, for defendant in error.

The policy of insurance and the endorsement thereon covered the loss in question. Federal Life Ins. Co. v. White, 23 S. W . (2d) 832; Dorsey v. Fidelity Union Casualty Co., 52 S. W. (2d) 775; International Travelers Assn. v. Marshall, 131 Texas 258, 114 S. W. (2d) 851.

MR. JUDGE TAYLOR delivered the opinion of the Commission of Appeals,, Section B.

On October 1, 1935, Standard Accident Insurance Company issued to the Trustees of International-Great Northern Railroad Company, debtor, a public liability policy. The "operations" covered by the policy, generally speaking, were, according to classifications specified thereon, railroad construction, concrete construction, excavation, iron and steel erection of buildings, pile driving, wrecking of buildings and the operations of salesmen, collectors and messengers. By endorsement Guy A. Thompson, sole Trustee for the debtor company, was made the assured.

It was provided by the insuring agreements of the policy that the insurance company would pay the loss from the liability imposed by law upon the assured for damages arising out of bodily injuries sustained by reason of, and during the prosecution by the assured of the operations above classified, whether sustained on or away from premises occupied for the purpose of performing such operations. By endorsement attached to the policy before it became effective, the following stipulation was added:

"Whereas, the State of Texas * * * will be engaged * * * through contractors in the construction of and * * * repairs to underpasses * * * together with the approaches thereto, and other work in connection therewith * * * *which will be located in, on, over or under property* * * * owned, controlled, operated, used, or occupied by assured at various points on the respective railroad lines of the assured within the State * * *. And, whereas, the assured will from time to time engage in * * * *work* in connection with, and on account of, *the construction hereinbefore referred to*, and assured desires to provide public liability insurance *as respects such projects*: Now, therefore, anything in this policy, endorsements, declarations and statements to which this endorsement is attached, to the contrary notwithstanding, * * * the Company hereby agrees to insure said assured against loss from liability imposed by law upon the assured for damages on account of bodily injuries * * * accidently suffered * * * by any person, * * * caused by or in any way arising from, out of or by reason of any *work* whatsoever being done in connection with or incident to *the construction of said underpasses, and other work in connection therewith* and incident thereto and/or by reason of the ownership of, occupancy, use, operation or control by the assured of the *premises* and property to be *described and referred to,* * * *."

It is further stipulated by the policy that bodily injuries caused, among other things, by any rolling stock "elsewhere than upon any spur or sidetrack located within or upon and serving said premises," or those caused by any accident, "occurring after the final completion of said * * * operations at the place of occurrence," or "elsewhere than upon said premises," were excluded from the coverage.

When construction of projects such as the one presently to be described were being contemplated by the State highway department, several railroads were involved, as is shown by a letter, parts of which were introduced by the Trustee and the

remainder by the insurance company. The following excerpt makes clear the background out of which the policy arose, and the nature of the railroad company's work in connection with the various projects in the contemplation of the parties:

"* * * a form of agreement was executed between the State of Texas and the railroad companies outlining the work to be done and the manner in which that work was to be carried on. That agreement specifically provides how the plans and specifications were to be drawn and approved and specifically provided how the *work* shall be accomplished. It provides that a certain type of work will be done by contractors, and certain specific operations were to be done by direct employees of the railroad company. The railroad company generally *must furnish certain materials at the site, erect connections, switches, etc., and do certain temporary false work, foundation piling, trestle work, signal pole and wire line erection, etc.* As the proposal progressed a committee of attorneys representing various Texas railroads was appointed to negotiate for insurance covering the various grade separation projects and meetings were had with that committee by various insurance representatives, and subsequently a plan was developed clearly outlining the coverage to be afforded to the railroad companies."

The form of what may be termed the "master-policy" was the result. Contemporaneous with the undertaking of a new project by the State and the assured an endorsement would be added describing such project. On April 7, 1936, the policy was extended to cover "the *assured's* operations in connection with" an underpass project.

The endorsement, other than formal parts, is as follows:
"In consideration of the premium as provided for in the Policy to which this endorsement is attached and forms a part, it is hereby understood and agreed that said Policy is extended to cover the assured's operations in connection with the following described contract:

| LOCATION OF WORK | DESCRIPTION | PROJECT NO. |
|---|---|---|
| Near Pearsall, Frio County, Texas | Underpass | WPGH 273-B |

"Nothing herein contained shall be held to vary, waive, alter or extend any of the terms, conditions, agreements or declarations of the undermentioned Policy other than as above stated."

The underpass was located about three miles from Pearsall, and the work to be done was the widening of the underpass. The contract was let by the Highway Department to its contractor (Brown & Root, Inc.). The contractor, in order to accommodate public travel over the highway (there being no public crossing over the tracks of the railway company in that vicinity nearer than twelve miles), constructed a detour around the scene of the underpass work. At a point on the detour where the road passed over the tracks (551 feet north of the underpass) the contractor constructed a temporary crossing. Several months thereafter Henry D. Talley (a member of the public using the highway) was killed when his automobile was struck on the crossing by one of the railway company's regular passenger trains.

The Trustee and insurance company differed upon the question of whether the accident came within the policy coverage but were in agreement that regardless of whether it did or not it was mutually desirable to first settle the claim of the heirs of deceased and then litigate between themselves the question in dispute. Settlement was accordingly made with the heirs by the Trustee for $2500, which he paid without prejudice to his right to prosecute a suit against the insurance company upon the policy for its recovery. Accordingly he filed against it this suit to recover the amount paid out by him to the heirs in settlement of the liability to them. The trial court rendered judgment in favor of the Trustee upon an instructed verdict in his favor, which was affirmed by the Court of Civil Appeals. 146 S. W. (2d) 238. Writ of error was granted upon the insurance company's application.

The sole question necessary to be discussed, under our view of the case is whether the policy coverage protected the trustee from loss resulting from the accident.

The following stipulation was entered into by the parties during the trial of the case:

"It is agreed that the train that was involved in this accident which resulted in Mr. Talley's death was not a work train, but was an ordinary passenger train. It is further agreed that the train that caused Mr. Talley's death was a passenger train on its regular schedule, carrying passengers for hire upon the main line track, and not upon a spur track of the plaintiff company at the time."

It is undisputed that no widening work was being done at the temporary crossing at the time of the accident. The underpass work is not mentioned in the policy except in the endorsement set out above in which the work, its location and the project number, are specified. It will be observed the insurance provided is limited to, or, stating it another way, is not extended to cover, any operations other than "the *assured's operations* in connection with" the underpass. None of its other operations, such as those performed by it in its regular business of hauling passengers or freight for hire, are purported to be covered. The sole connection between the accident and the work of widening the underpass appears to be, as will presently be pointed out, that it occurred upon the temporary crossing which was constructed several months before the accident by the contractor beyond the scene of operations where the work on the project was in progress.

■ It is a familiar general rule of construction of insurance contracts that the entire policy, together with its endorsements, must be looked to in ascertaining the indemnity intended by the parties; and that the language must be construed with reference to the subject matter of the contract in the light of the situation with which the parties were dealing. 24 T. J. secs. 23 and 24, pp. 696-8, citing, among other cases, Stowers Fur. Co. v. Amer. Indem. Co. (Com. App.), 15 S. W. (2d) 544 and Brown v. Palatine Ins. Co., 89 Texas 590, 35 S. W. 1060. See also the statement of the general rule in 22 Texas Digest (Insurance), Key number, 146 (1); also in Couch's Cyclopedia of Insurance Law, Vol. 1, sec. 174, pp. 354-6.

■ In the present case the parties may be fairly presumed to have intended to cover the risk connected with *the assured's work in connection* with widening the underpass. The assured's work in connection with the project appears to have been distinct from that done by it in carrying on its regular business of hauling freight for hire. It nowhere appears that any work required to be done by the assured in connection with the underpass project had *any substantial casual connection* with the accident. There is no evidence that it was engaged at the time of the accident in any of the operations specified in the classifications covered by the policy (enumerated at the outset of this opinion). The accident on the other hand appears from the evidence to have been within at least three of the exclusions stipulated in the policy. It occurred (1) "after completion of said * * * operations at the place of occurrence, that is, at the

temporary crossing after Brown & Root had completed the work done there; (2) it occurred, not upon "any spur or side-track located within or upon and serving said premises," but upon assured's main track; and (3) it occurred, not at the scene of the underpass premises, but upon a temporary highway detour which ran around and away from the premises. *The language of the exclusions referred to is clear and specific and needs no construction to make obvious its meaning.* There is no ambiguity upon which to invoke the well established rule that ambiguous language in a contract must be construed most strongly against the writer.

The policy as a whole, when executed by the parties included (under various headings), declarations, endorsements, exclusions insuring agreements, and statements under each respectively, relating thereto. One of the endorsements provides insurance against liability for acicdent "caused by or in any way arising from, out of or by reason of, any *work* being done in connection with or incident to the construction of said underpass * * *and other *work* in connection therewith and incident thereto * * *." The endorsement carrying the foregoing insurance agreement stated, in effect, that its attachment added another obligation, *"regardless of anything in the policy* (including its endorsements, declarations and statements) *to the contrary notwithstanding."* The italicised general statement is made the basis of a contention by the assured that its effect was to eliminate, or render of no effect, the *specific exclusions* pointed out above.

We cannot agree with this contention. To uphold it would' be contrary to the authorities above cited to the effect that the policy must be viewed from its four corners and effect be given to all of its provisions, including those relating to risks excluded as well as those included. The language relied upon does not in terms eliminate the "Exclusions" provisions of the policy. To give the *general language* relied upon such effect would be to write into the policy contract *by the mere process of construction a specific provision* which it does not contain.

■ It is not alleged or claimed that the work in progress at the underpass affected in the least the manner in which either Talley or the train approached and moved upon the crossing. The argument is made, however, by the Trustee that Talley would not have been upon the crossing that day but for the work in progress at the underpass, in that, as alleged by the Trustee,

"had it not been for such * * * work the accident * * * could never have happened, because * * * Talley, * * * would have used the underpass * * *." Such is the casual connection between the accident and the language of the insuring provision of the policy which, the assured contends, brings the accident within the purview of the clause stipulating coverage for "the assured's operations in connection with" the *work* on the project.

We cannot agree. The mere fact that Talley used the crossing provided by the Highway Department, without more, is too remote in the matter of causation to be given legal force and effect. The speculations relied upon as establishing the connections are too uncertain. If Talley had remained at home on that day because of the existing status on the right of way in the vicinity of the underpass and had been killed by an accident suffered on his own premises, it would hardly be urged that his death arose out of, or was caused, (in a legal sense) by *work being done* on that day at the underpass, or that it was due to *work that had theretofore been done* on widening the underpass.

Regardless of our holding with respect to the elimination of the exclusions provision just discussed, the language of the endorsement does not cover the accident involved. It will be observed that it insures only against accidents "caused by or in any way arising from, out of or by reason of any *work* whatsoever being done in connection with or incident to the construction of said underpass * * * and other *work* in connection therewith and incident thereto * * *." If the accident was not caused by *work* being done by the assured, or that had been done by the assured, in connection with the work on the underpass, it is not within the coverage contracted for.

The Trustee relies upon Panhandle Steel Products v. Fidelity Union Cas. Co. (Civ. App.), 23 S. W. (2d) 799. The case does not involve so remote a relationship between the coverage and the accident there in question as is presented in the present case. The Steel Products Company was engaged in the business of selling structural iron and steel and delivering same to buildings in which the products were to be used. It employed men and trucks and trailers to be used in making delivery. The coverage was against loss from liability imposed for accidents on account of injuries suffered "as a result of the * * * use" of trucks and men in hauling and making delivery of the iron and steel sold by the company to its customers.

While using the truck in delivering an iron beam (half of the beam still rested thereon), a pedestrian was struck by the end of the beam as it moved across the sidewalk into the building. The accident resulted from, and arose directly out of, the making of the delivery by the assured and while it was using the truck in performing the work, and was, as the court properly held, within the coverage provision. If, however, some one had accidentally stumbled and fallen over the beam, thus injuring himself, after delivery had been completed, (without negligence, of course) the accident, while resulting in a remote sense from the use of the truck in delivering the beam, could not properly be held to have been a substantial cause of the injuries.

In the present case the work of constructing the crossing had ended. If while constructing it, or if because of the manner of its construction, Talley had been struck by the train, the accident would have been similar to that in the Steel Products case, since it would have had a direct connection with the work *being done* in widening the crossing or other work that had been done in widening it. After the crossing had been constructed, and completed without negligence, the accident occurring there was as remotely connected with the work of widening the crossing as an accidental stumbling over the delivered beam would have been to the use of the truck in making its delivery. The distinction between the holding in the Steel Products case and that of the Court of Civil Appeals in the present case is apparent.

No case has been cited by the Trustee involving any policy provision more nearly similar in principle to that involved in the present case than the Steel Products case. Other cases, Dorsey v. Fidelity Union Cas. Co. (Civ. App.), 52 S. W. (2d) 775, writ dismissed; Fed. Life Ins. Co. v. White, 23 S. W. (2d) 832, writ refused; Merchant's Co. v. Hartford Acc. Indem. Co., 187 Miss. 301, 188 So. 571, 192 So. 566; Owens v. Ocean Acc. & Guar. Corp., 194 Ark. 817, 109 S. W. (2d) 928; Commercial Casualty Ins. Co. v. Tri-State Transit Co. of La. Inc., 190 Miss. 560, 1 So. (2d) 221, 133 A. L. R. 1510, and State ex rel Butte Brewing Co. et al v. District Court, etc. 110 Mont. 250, 100 Pac. (2d) 932, are cited by the Trustee. Their discussion further than to say they are not as nearly in point as the Steel Products case, would unduly prolong this opinion.

It is obvious from what has been stated that we hold the connection between the accident at the crossing and the work

of widening the underpass is too remote to be legally within the policy coverage.

The trial court instead of instructing a verdict and rendering judgment in favor of the Trustee, should have rendered judgment in favor of defendant. The judgment of the Court of Civil Appeals affirming that of the trial court is reversed and judgment is here rendered for plaintiff in error insurance company.

Opinion adopted by the Supreme Court April 15, 1942.

Rehearing overruled May 13, 1942.