Thomas E. NICHOLAS, Plaintiff In Error,

v.

OKLAHOMA CITY MAILER'S UNION NO. 30 et al., Defendants In Error.

No. 36457.

Supreme Court of Oklahoma.

June 21, 1955.

Looney, Watts, Ross, Looney & Nichols, Oklahoma City, for plaintiff in error.

Schwoerke & Schwoerke and James E. Grigsby, Oklahoma City, for defendants in error.

BLACKBIRD, Justice.

The order in which the parties to this appeal appear here is the same in which they appeared in the trial court; and we will hereinafter refer to them as "plaintiff" and "defendants", as they appeared there.

Plaintiff, at all times material to this controversy was an employee of the Oklahoma Publishing Company, which publishes the Daily Oklahoman newspaper and other publications in Oklahoma City. Previous to May 16, 1949, his position with said company was that of a "Station Manager." On May 14, 1949, members of the defendant union who were regularly employed in the "mailing room" of said company ceased their work. This cessation has been described both as a "lock-out" and a "strike", and was accompanied by picketing. On May 16, 1949, plaintiff was transferred from his job as station manager to one of the jobs in the mailing room, apparently left vacant by one of the union members on strike. The next day, and again on June 7, 1951, the defendant union caused to be published in another newspaper, called "The Advertiser", large advertisements concerning the strike. The first one was headed or entitled in large black type: "Know Your Neighbor." It announced, among other things, that members of the defendant union had been "locked out." The ad also contained plaintiff's name and address in a three-column list of names and addresses of other persons who apparently had continued to work for the publishing company during the strike. The last advertisement shown to have been thus published by the defendant union was entitled "Strikebreakers", and in the lower portion

thereof, displayed individual photographs, with their names and addresses immediately beneath, of six of the publishing company's employees, including plaintiff, all under the following statement:

"The following description of a strikebreaker by a famous author is as follows:

" 'He is to his trade what a traitor is to his country and though both may be useful in troublesome times, they are detested by all when peace returns. When help is needed, a strikebreaker is the last to contribute assistance and the first to grasp a benefit he never labored to procure.

" 'He cares only for himself; he sees not beyond the extent of a day, and for monetary approbation he would betray his friends, family and country. In short, he is a traitor on a small scale, who first sells the working man and is himself afterwards sold in his turn by his employer, until at last he is despised by both and detested by all. He is an enemy to himself, to the present age and to posterity.'

"Whether non-union employes replace union members who have been 'locked out' as technically described by the union, or whether they are employed to break a 'strike' they are 'strikebreakers' to any union member. So that you may know if your neighbor is a Strikebreaker in our view, we are listing below the names, addresses and pictures of some of these men and women as they appear in the personnel directory of The Times and Daily Oklahoman which has just been released, they are as follows: * * *"

Thereafter, on October 29, 1951, plaintiff commenced the present action against the union, and three of its officers, as defendants, alleging, in substance, that said defendants' causing the above described advertisements to be published was libel and a violation of plaintiff's alleged "right to privacy", and praying both for damages against them in the sum of $5,000 and an injunction restraining them "from invading * * * (his) rights * * * and for

other relief as the court may deem just and equitable."

In their answer, defendants did not specifically deny publication of the advertisements complained of but, among others, asserted the following alleged defense:

"Defendants state that they have the right to disseminate and publish all of the facts concerning its labor dispute with said Publishing Company, which right is guaranteed to them by the Federal Constitution and that said advertisements complained of were made to make known the facts of said labor dispute existing between said Mailers Union and said Publishing Company, which dispute is a matter of public concern and interest."

At the trial, without a jury, the trial court sustained defendants' general demurrer to plaintiff's evidence and thereafter entered judgment denying him any relief, upon finding that the "publications" involved were neither "libelous per se" nor invaded "plaintiff's right of privacy."

In this appeal from said judgment, plaintiff concedes that his evidence was insufficient to show that he suffered any special damages by reason of the advertisements; but he maintains that the trial court erred in not holding certain portions of the advertisement of June 7th, (quoted in his brief) libelous per se, which would have obviated proof of such damages. We agree that said advertisement could be considered defamatory. Our Statute, Tit. 12 O.S.1951 § 1441, defines libel in part, as follows:

" * * * false or malicious unprivileged publication by writing, printing, picture, or effigy or other fixed representation to the eye, which exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, * * *."

In ruling upon a demurrer, such as the one involved here, a court can hold as a matter of law that a publication is not libelous, only when it can say that the publication is not reasonably capable of any defamatory meaning and cannot reasonably be understood in any defamatory sense. See Fahy

v. Melrose Free Press Inc., 298 Mass. 267, 10 N.E.2d 187, and cases therein cited. As will be noted the advertisement of June 7th, portrays plaintiff (with the other persons named and pictured therein) at least by strong inference, as a potential betrayer of his "friends, family and country", as an enemy "to the present age and to posterity", and as "a traitor on a small scale, who first sells the workingman * * *". We cannot say as a matter of law that such words are not capable of being reasonably interpreted and understood by the public generally in such a way as to expose those about whom they were printed, to "public hatred, contempt, ridicule or obloquy * * *", or tend to deprive them of "public confidence." It appears to us that such a characterization of a person may be more than unpleasant. See Wimmer v. Oklahoma Pub. Co., 151 Okl. 123, 1 P.2d 671. Our attention has been directed to no case in which comparable epithets have been held not libelous, unless privileged. In this connection, see Soley v. Ampudia, 5 Cir., 183 F.2d 277, 19 A.L.R.2d 689; Emde v. San Joaquin County Central Labor Council, 23 Cal.2d 146, 143 P.2d 20, 150 A.L.R. 916; Bereman v. Power Pub. Co., 93 Colo. 581, 27 P.2d 749, 92 A.L.R. 1024, and the Annotations thereto. We think such words, if understood by persons of ordinary intelligence as referring to plaintiff, are presumptively malicious and this presumption could only be overcome by proof to the contrary. Defendants' good faith or lack of malice, like the alleged privilege to publish them, was a matter of defense. Craig v. Wright, 169 Okl. 245, 43 P.2d 1017; Higbee v. Owens, 155 Okl. 93, 7 P.2d 854; Missouri K. & T. Ry. Co. of Texas v. Watkins, 77 Okl. 270, 188 P. 99. We cannot, without more of a showing in the record, hold as a matter of law that the publication in this case was privileged.

A "privileged communication" has been defined by this Court, Magnolia Pet. Co. v. Davidson, 194 Okl. 115, 148 P.2d 468, as:

"* * * one made in good faith, upon any subject matter in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty, and which contains matter which, without the occasion upon which it is made, would be defamatory and actionable."

In this connection, see also Tit. 12 O.S.1951 § 1443. We find no basis in plaintiff's evidence, and defendants point out none, that would warrant holding that they had an "absolute" privilege arising from a duty to readers of The Advertiser to communicate to them statements such as were contained in the advertisements involved; nor have they yet had any opportunity to establish a "conditional" or "qualified" privilege. In this connection see Sanford v. Howard, 185 Okl. 660, 95 P.2d 644. Either of such defenses may involve many matters such as whose and what "interest" the advertisements were to serve, whether that of the public generally or that of the members of the union, individually or collectively. Plaintiff's evidence reveals neither the purpose of the strike or "lock-out", nor the purpose of the advertisement. As to this and related matters, see Restatement of the Law, Torts, Vol. 3, sec. 593–595, 598, 599, 604, et seq. The purpose of advertisements is usually not strictly confined to the dissemination of news, and the last advertisement was more than any purported statement of fact; it also contained expressions of opinion. In view of these and many other considerations, not clearly reflected by plaintiff's evidence, and necessary to a correct decision as to defendants' legal responsibility to plaintiff, if any, for causing publication of the advertisements, the trial court's judgment was error. Having reached this conclusion, it is unnecessary to consider the arguments pertaining to plaintiff's other alleged causes of action.

The judgment appealed from is therefore reversed with directions to said court to vacate it and grant a new trial.

JOHNSON, C. J., WILLIAMS, V. C. J., and WELCH, CORN, ARNOLD, HALLEY and JACKSON, JJ., concur.